UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES – GENERAL

Case No.   2:25-cr-503-BFM                              Date:  11/21/2025

Present: The Honorable:   Brianna Fuller Mircheff, U.S. Magistrate Judge

Interpreter

|  C. Howard  |  | John Paul Lecedre |
|---|---|---|
| *Deputy Clerk* | *Court Reporter / Recorder* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s) | Present | Cust | Bond | Attorneys for Defendants: | Present | App |
|---|---|---|---|---|---|---|
| Russell Gomez Dzul | N/A | | | DFPD James Threatt<br>DFPD Hannah Bogen | N/A | X |

**Proceedings: (In Chambers) Order on Motion to Suppress (ECF 43)**

Pending before the Court is Defendant Russell Gomez Dzul's Motion to Suppress. For the reasons set out in the Order, the Motion is **granted in part and denied in part**.

**A.   Factual Background**

Defendant Gomez Dzul moved to suppress all evidence that flowed from his detention on June 7, 2025. (ECF 43 (Mot.).) The government opposed the Motion (ECF 50 (Opp'n)) and Gomez Dzul filed a reply (ECF 57 (Reply)). The Court heard argument on the Motion on November 12, 2025. (ECF 63.) The matter is therefore fully briefed and ready for decision.

Both parties indicated that no evidentiary hearing was required, and so the Court bases its decision on the exhibits attached to the parties' submissions. The Court finds as follows:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

On June 7, 2025, around 12:55 p.m., at least three Border Patrol Agents were patrolling an area in Los Angeles County, California.[1] They saw an individual run away from their vehicle, and at least one of the agents got out of the car and chased the individual. (Opp'n Ex. 1 at 3.) The bodycam footage reflects the agent chasing the individual through multiple parking lots. (*See* Mot. Ex. A at 0:50-1:44.) He then lost sight of him, but saw another individual, later identified as Gomez Dzul, ride his bicycle through the same parking lot. An agent claimed Gomez Dzul "looked toward the agents" and then "fled" in the other direction. (Opp'n Ex. 1 at 3; Opp'n Ex. 2 at 3.) Agents chased him on foot to a house and found him hiding between a car and a wall. An agent grabbed his arm and pulled him from his hiding spot, put him to the ground, and handcuffed him.[2] From there, they put Gomez Dzul into the back seat of the Border Patrol vehicle and drove off.[3] As they did, they continued to discuss the individual they had been trying to find initially.

---

[1] The government has redacted the names of all the Border Patrol agents in the report, making it exceedingly difficult to tell how many individuals are involved and what role each of them played in the incident. (*See* Opp'n Ex. 1.) Going forward, if there is reason to keep these individuals' names out of the public record, the government should move to seal the exhibit and provide the Court an unredacted version.

[2] One Report of Investigation reflects the agent's claim that Gomez Dzul "physically resisted by pulling away his arms to keep them in front." (Opp'n Ex. 1 at 4.) Another states that Gomez Dzul "physically resisted by forcefully pulling away from [his] grip." (Opp'n Ex. 2 at 3.) The Court has reviewed the video of the incident. It shows that agents grabbed Gomez Dzul by his arm to pull him out from behind the car, they then grabbed him by both arms and began pushing his head down while pulling his arms behind his back. (Mot. Ex. A at 2:45-2:53.) Without making any finding as to whether resistance occurred during that sequence, from the video it appears that any possible resistance was so minor as to not figure in the Fourth Amendment analysis.

[3] The Report of Investigation claims that Gomez Dzul "tried pulling away and was pushed into [an agent, name redacted in the original] while refusing to put his foot inside the vehicle." (Opp'n Ex. 1 at 4.) The interaction between Gomez Dzul and the agent is not shown on the bodycam video provided to the Court, and the government has not put a declaration from said agent into the record. The Court therefore does not rely on any supposed act of resistance in this sequence either.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Bodycam footage reflects that the agents and Gomez Dzul drove some distance; the record does not reveal exactly how far but more than two minutes elapsed on the bodycam footage. (Mot. Ex. A at 3:55-6:16.) Gomez Dzul and an agent were together in the back seat of the car. As they drove, the agent asked Gomez Dzul why he ran ("I thought it was the marathon of Los Angeles") and what his immigration status was ("I came with a visa. And my wife has already adjusted me."). (Mot. Ex. D at 3.) The agents then returned to discussing some other individual who had evaded officers. (Mot. Ex. A at 6:00-6:10.) Agents stopped the car and looked at another residence. The bodycam footage provided to the Court ends there, with several agents and two to three Border Patrol cars looking for some individual and with Gomez Dzul in the backseat of the car. (Mot. Ex. A at 6:10-8:00.)

According to the Report of Investigation, "[s]hortly after"—again, the record does not reveal how long—a group of protesters gathered around two agents who were on foot. (Opp'n Ex. 1 at 4.) The car in which Gomez Dzul was riding circled back to pick up the two agents. (Opp'n Ex. 1 at 4.) An agent opened the door next to Gomez Dzul to permit the agents who were on foot to enter the car quickly. (Opp'n Ex. 1 at 4.)

According to the agents, at that point Gomez Dzul attempted to flee, "pushing forward toward the open door and thrusting his body forward in an active attempt to escape custody amid the chaotic environment." (Opp'n Ex. 2 at 4.) In the chaos, an agent pulled out pepper spray, and, at the same time, began trying to push Gomez Dzul back into his seat and re-secure him. (Opp'n Ex. 2 at 4.) The agent claims an "accidental, minor discharge of OC spray occurred" to Gomez Dzul's right cheek area. (Opp'n Ex. 2 at 4.) The agent claimed that, despite the pepper spray, Gomez Dzul continued to "resist arrest and detention" but another agent quickly assisted to get Gomez Dzul back into the car. (Opp'n Ex. 2 at 4.) Agents claim that, during this interaction, Gomez Dzul assaulted an agent.

Agents "conducted a probable cause arrest" for assault and transported Gomez Dzul to the Customs and Border Patrol Office in Los Angeles. (Mot. Ex. E at 3; Opp'n Ex. 1 at 4.) That afternoon, around 3:12 p.m., Border Patrol Agents Mendoza and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Gonzalez came to speak with Gomez Dzul. Agent Gonzalez spoke to Gomez Dzul in Spanish. He asked Gomez Dzul his name and date of birth. (Mot. Ex. C at 3.) He then advised Gomez Dzul of his right to remain silent and to an attorney. The following colloquy then occurred:

| | |
|---|---|
| Gonzalez: | Do you understand your rights? |
| Gomez Dzul: | No |
| Gonzalez: | You don't understand rights? |
| Gomez Dzul: | Oh. The ones you mentioned? Yes. |
| Gonzalez: | The ones I just read to you. Mhm. |
| Gomez Dzul: | Yes. |
| Gonzalez: | OK. Are you willing waiving your rights and talk to me? |
| Gomez Dzul: | I don't understand. |
| Gonzalez: | Do you want to talk to me right now or not? |
| Gomez Dzul: | Yes. |
| Gonzalez: | Yes. OK. Mhm. |

(Mot. Ex. C at 3-4; *see also* Opp'n at 9 n.2 (accepting defense's translations for purposes of the motion).) From there, the agents asked Gomez Dzul questions in Spanish, and he answered them.

Later that day, around 6:30 p.m., individuals with Homeland Security Investigations came to interview Gomez Dzul. Agents read Gomez Dzul his rights, and Gomez Dzul invoked his right to an attorney. (Mot. Ex. E at 2.)

**B.   Discussion**

The defense moves to suppress all evidence from the moment agents detained—in their view, arrested—Gomez Dzul, including the videos, the agents' testimony, and Gomez Dzul's statements. (Mot. at 15.) The Court first discusses the legality of the interactions between Gomez Dzul and the agents, and then discusses what, if anything, should be suppressed.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

**1.     The initial interaction was an unlawful arrest.**

With respect to the initial interaction between agents and Gomez Dzul, the government alleges that the interaction was merely a stop, supported by reasonable suspicion that Gomez Dzul was unlawfully in the country. (Opp'n at 9-11.) The defense, on the other hand, claims that it is an arrest and that no probable cause to arrest existed. (Mot. at 12-14.)

The Court agrees with the defense that the interaction was an arrest and not merely a stop. In deciding whether a stop has "escalated into a full-blown arrest," courts consider "the severity of the intrusion, the aggressiveness of the officer's actions, and the reasonableness of the officer's methods under the circumstances." *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 940 (9th Cir. 2020) (citing *Washington v. Lambert*, 98 F.3d 1181, 1188-89 (9th Cir. 1996).)

Here, the evidence demonstrates that Gomez Dzul was arrested. Gomez Dzul was pulled out from behind the car where he was hiding, pushed toward the ground, and his hands were pulled behind his back and handcuffed. Handcuffing is indicative of an arrest. *United States v. Juvenile (RRA–A)*, 229 F.3d 737, 743 (9th Cir. 2000) (finding handcuffing "the clearest indication that [the individual] was no longer free to leave and therefore find it to be the point of arrest"). He was then pulled over to a Border Patrol vehicle, put in the back seat, and driven away from the scene. Movement away from the location of the initial interaction also supports a finding of an arrest. *Hayes v. Florida*, 470 U.S. 811, 816 (1985) (finding movement of individual from a "place in which he is entitled to be" to the police station is "sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause"). Agents made no attempt to secure his bicycle, such that he would be able to continue on his way after brief questioning. For that matter, agents asked no questions before putting Gomez Dzul in their car and expressed only minimal interest in questioning him about his legal status once he was inside the car. Under these circumstances, a reasonable person in Gomez Dzul's position would not believe he was going to be free to leave after brief questioning. *See United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009). The agents' conduct was therefore an arrest. *Reynaga Hernandez*, 969 F.3d at 941 (finding arrest where individual

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

suspected of immigration violations was handcuffed, taken outside of courthouse, and placed in patrol vehicle).

At the time the arrest occurred, agents did not have probable cause to support an arrest. When they put him into the car and drove away, agents knew Gomez Dzul looked nervously in their direction, rode away from them, and then hid behind a car. Based on those facts, the agent stated they "suspected" Gomez Dzul was in the country unlawfully. (Opp'n Ex. 2 at 3.) But "mere suspicion . . . or even strong reason to suspect are not enough" for probable cause. *Harper v. City of L.A.*, 533 F.3d 1010, 1022 (9th Cir. 2008). And the agents did not have more here. The Court concludes that the initial interaction was an arrest that was not supported by probable cause.

**2. The alleged assault was an intervening circumstance that attenuated the taint of the unlawful arrest.**

Gomez Dzul argues that all evidence obtained by virtue of that unlawful arrest—even the testimony of the officers concerning the alleged assault—must be suppressed. (Mot. at 15; Reply at 3-8.) The government disputes that claim, arguing that even if the initial interaction was unlawful, Gomez Dzul's conduct in allegedly assaulting the agent was an intervening act that broke the chain of an illegality in the initial interaction. (Opp'n at 11-13.) The Court agrees with the government's reasoning.

In general, the fruits of a Fourth Amendment violation must be suppressed. But evidence obtained through "means sufficiently distinguishable to be purged of the primary taint" may be admitted. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). In deciding that question, it is not enough that the initial unlawful conduct was a "necessary condition leading up to the [individual's] act." *United States v. Garcia*, 516 F.2d 318, 319-20 (9th Cir. 1975). That is, it is not enough that, "but for" the unlawful arrest, Gomez Dzul would not have been in a position to assault anyone. *Id.* at 320.

Instead, the question is whether "evidence was obtained 'by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

taint.'" *United States v. Baker*, 58 F.4th 1109, 1121 (9th Cir. 2023) (quoting *Garcia*, 516 F.2d at 319). Here, the agents did not discover evidence of the alleged assault by exploiting the prior illegal conduct; instead, the alleged assault was a voluntary act, in which the unlawful arrest played only a "but for" role. If a suspect's response to an illegal stop "is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime." *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982)). Any other rule would essentially give an individual license to assault law enforcement because he is unlawfully arrested, and that is not the law in this Circuit. *United States v. Span*, 970 F.2d 573, 579 (9th Cir. 1992) (a defendant has no common-law right to resist arrest simply because the arrest is unlawful).

Whether an assault occurred will be a matter for the jury, but the agents' reports and affidavits support a finding of probable cause that an assault occurred. (Opp'n Ex. 1 at 4; Opp'n Ex. 2 at 4.) That alleged assault purged of the taint of the illegal arrest. The Court therefore declines to suppress all evidence of the assault itself as a fruit of the initial unlawful arrest.

### 3. Gomez Dzul waived his rights under *Miranda*.

Gomez Dzul argues that, even if the Court were to find that the assault is an intervening circumstance, Gomez Dzul's statements to Agents Mendoza and Gonzalez should nevertheless be suppressed because they were taken in violation of *Miranda*. (Mot. at 17-20.)

Under *Miranda v. Arizona*, a suspect must be given certain warnings before he may be subjected to custodial interrogation. 384 U.S. 436, 444 (1966). Where a suspect invokes either his right to remain silent or his right to counsel, law enforcement must "scrupulously honor" that invocation. *Id.* at 479. To invoke either right, however, the suspect must do so unambiguously. *Davis v. United States*, 512 U.S. 452, 459 (1994). If the suspect makes a statement that is ambiguous or equivocal, law enforcement is not required to end the interrogation or ask clarifying questions. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Here, the agents' advisal covered the relevant rights, and Gomez Dzul did not unambiguously invoke his right to remain silent or his right to an attorney. He makes two points, however, about why any waiver of his rights was nevertheless invalid.

First, he argues that he should have been provided a "neutral interpreter." (Mot. at 18-19.) Gomez Dzul was interviewed in the Spanish language by a Spanish-speaking agent—a situation little different from an agent who speaks English interviewing an English-speaking suspect. Gomez Dzul does not point to any specific issue with the agent's language abilities. Nor has the defense pointed the Court to any caselaw suggesting that a neutral interpreter is constitutionally required. This first argument is not persuasive.

Second, Gomez Dzul argues that his waiver was not knowing and intelligent. (Mot. at 19-20.) In evaluating whether a waiver is knowing and intelligent, courts consider the totality of the circumstances, including:

> (i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system.

*United States v. Price*, 980 F.3d 1211, 1226-27 (9th Cir. 2019) (quoting *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007)).

Here there was no written waiver form executed at the time of the interview, and the defense represents that any prior interaction Gomez Dzul had with the justice system was minimal and dated. (Mot. at 19.) Even so, several facts weigh in favor of finding the waiver knowingly and intelligently made: First, there is no indication that Gomez Dzul's mental capacity was impaired in any way. There is no record of any mental illness or issues of cognitive capacity. The defense argues that Gomez Dzul's mental capacity was worn down after being in custody "for hours" (Mot.

at 19) but the record reflects that Gomez Dzul was first contacted by agents around 12:55 p.m., and that this interview took place at 3:12 p.m. (Mot. Ex. C.) Contrary to the defense's claim that he was exhausted and confused, his mannerisms on the video do not reflect exhaustion or confusion, and the content of his conversation with the agents was coherent. (*See generally* Mot. Ex. B.) Gomez Dzul was advised of his rights in his native tongue, and his rights were individually (if not repeatedly) explained to him. (Mot. Ex. C.)

The defense argues that Gomez Dzul indicated confusion concerning his rights, and that that factor should tip the scales in their favor. Gomez Dzul did initially state that he did not understand his rights, but when the agent followed up, he said, "Oh. The one you mentioned? Yes." (Mot. Ex. C at 3.) The agent repeated, "The ones I just read to you," and Gomez Dzul said, "Yes." (Mot. Ex. C at 3.) The agent asked whether Gomez Dzul was "willing waiving [his] rights and talk to [the agent]?" Gomez Dzul said he didn't understand, but when the agent asked, "Do you want to talk to me right now or not?" Gomez Dzul said he did. (Mot. Ex. C at 4.) Gomez Dzul then proceeded to answer the agent's questions without hesitation. Neither his words nor his affect as shown in the video reflect confusion about his *rights*, so much as brief confusion about the agent's questions—the second of which, taking the translation as accurate, is an awkward construction. Weighing the totality of the facts, the Court finds that Gomez Dzul's waiver was knowing and intelligent, and that agents did not violate *Miranda* in continuing their interrogation.

### 4. The fruits of the initial illegal arrest

Given the above analysis, the only potential fruits of unlawful conduct are those that flowed from the initial unlawful arrest. The most important fruit of that initial arrest was Gomez Dzul's statements concerning his immigration status made while in the back seat of the Border Patrol vehicle. The defense argues that those statements should be excluded, either because they are the product of an unlawful arrest or because agents did not provide a *Miranda* warning. (Mot. at 16-17.) While that is likely correct, the government has indicated that it does not intend to introduce those statements in its case-in-chief (Opp'n at 13-14.), making that question unnecessary to decide. *See United States v. Lampkin*, No. 3:15-cr-00005-05-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

SLG-KFM, 2016 WL 11680695, at *1 (D. Alaska Apr. 25, 2016), *report and recommendation adopted*, 2016 WL 11680696 (D. Alaska June 8, 2016) (declining to decide suppression question where government had committed not to introduce challenged statements in its case in chief).

The Court asked the defense whether there were further fruits of the illegal arrest that the defense would want to suppress, if the Court found the assault was an intervening circumstance. Based on a brief discussion, it appears that the *defense* may want certain evidence about that initial interaction to come in, while the government may want to exclude it, and that this may be a topic on which motions in limine may be forthcoming. The Court requires the parties to meet and confer in connection with motions in limine and now instructs the parties to fold this fruits question into its discussion on the motion in limine. If neither party decides to file a motion in limine on this subject, the parties should still meet and confer and be prepared to discuss this matter at the pretrial conference.

cc: Counsel of Record

|  | : |
|---|---|
| **Initials of Deputy Clerk** | CH |